K36PRAMO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LISA RAMACI,

                Plaintiff,

          v.                          17 CV 10084 (RA)

FEDERAL BUREAU OF
INVESTIGATION,

                Defendant.

------------------------------x
                                      New York, N.Y.
                                      March 6, 2020
                                      9:48 a.m.

Before:

                    HON. RONNIE ABRAMS,

                                      District Judge

                        APPEARANCES

OSEN, LLP
     Attorneys for Plaintiff
BY:  MICHAEL RADINE
            and
GAETA LAW FIRM
BY:  WILLIAM FRIEDMAN


GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
     U.S. Department of Justice
ANDREW E. KRAUSE
     Assistant United States Attorneys

K36PRAMO

(In open court)

(Case called)

MR. RADINE:  Michael Radine of Olsen LLC for plaintiff, Lisa Ramaci.

MR. FRIEDMAN:  Good morning, your Honor.  William Friedman of the Gaeta Law Firm.  I was prior counsel to Ms. Ramaci.  I'm here to assist Mr. Radine, or if the Court has any questions.

THE COURT:  Thank you very much.  Thanks for coming in today.

MR. KRAUSE:  Good morning, your Honor.  Andrew Krause from the U.S. Attorney's Office for the FBI.

THE COURT:  Good afternoon.  I'll just note that Mr. Krause and I worked together previously.

Just for efficiency, I'll tell you what I'm sort of thinking and, of course, I'll keep an open mind and I'll hear you all out on anything.  But as an initial matter, I'm inclined to agree with the government, that given the violent nature of the crime and the risk of retaliation or reprisal for those who assisted the FBI, that an implied assurance of confidentiality attaches at the very least to the names of the FBI sources and any information that could identify who those sources are.

And I think that plaintiff would agree, or did agree in the papers, to the redaction of those names; so that may not

K36PRAMO

even be in dispute.

What I think is the more difficult question, and I want to hear the parties out on, is whether an implied assurance of confidentiality also attaches to information about the crime that doesn't reveal the source's identity, and so that's really what I kind of want to focus on today.

So I'm happy, Mr. Krause, to hear from you first, if you'd like to be heard.

MR. KRAUSE: Sure. Thank you, your Honor. I think that your Honor's point about other information, if there are confidential sources, the information provided by those sources that might not be source identifying is still fully protected by the second clause of exemption 7(d).

This isn't something that we actually addressed in great detail in the briefing, but the second clause of 7(d) says that in the case of a record or information compiled by a criminal law enforcement authority -- I don't think there's any dispute about that here, it's the FBI -- in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation -- again, I don't think there's any dispute about that, it's either a criminal investigation or a national security intelligence investigation or both, that the operative part at the end then is -- information furnished by a confidential source can be withheld.

THE COURT: So we're focusing on 7(d), and we're

K36PRAMO

focusing on implied confidentiality, right?  So could there be a source or sources for whom the confidentiality of their identity is implied but not their information?

I mean, if you were just a witness to an attack on Fifth Avenue by a violent group or gang or someone you may worry about harming you in the future, and the FBI or the NYPD comes and talks to you, I can understand why it would be a natural inference that you don't want your identity to be disclosed.  But is it the natural inference that you didn't expect the information you provided about this crime to be disclosed?

MR. KRAUSE:  I think the natural inference is, theoretically, there might be some uses for that information.  It might be necessary to further prosecution of that crime.  It might be necessary for someone to come in and testify in court as to what they saw.  But there are any number of cases that say even if a witness who had an implied assurance of confidentiality comes and testifies in court, for FOIA purposes, that doesn't necessarily mean that the information that they provided to the FBI or another law enforcement agency has to be disclosed --

THE COURT:  But are those cases ones in which the information itself disclosed the identity, so that the information itself was assumed to be information that was to be kept confidential because it would reveal the source of the

K36PRAMO

person?

MR. KRAUSE:  Well, in those situations, I'm thinking of a scenario where a person is testifying in open court.  So the fact of their involvement in the case is known publicly.

THE COURT:  No, I get that.  But aren't we supposed to look back, with respect to implied confidentiality, aren't we supposed to look back at the time the statement was made and determine was confidentiality assumed?  Did that person assume that their identity would be kept confidential?

And my question is, and I don't think the law addresses this directly, but should I also be asking when that person came in and assumed that their identity would be kept confidential, in light of the violent nature of the crime, but never assumed that the information would be kept confidential?

It's not a situation where, you know, an incident happens in an apartment and the only person who could have known what happened is this person; so by even saying what happened during that incident, whether murder or robbery or rape or something else, you necessarily know who the confidential source is.

This is something that happened on an open street; so why should I be assuming that the information provided, that the person who provided that information assumed that that information could be kept confidential?

MR. KRAUSE:  I think the way the cases deal with this

K36PRAMO

is that if the person assumed that they had confidentiality, at most, they would assume that the information would be used for some sort of law enforcement purpose to further the investigation, which is not what FOIA is.

So it might be that their information had to be disclosed to a court, in the case of litigation, or it might have to result in someone's testimony, but this is a bridge too far.  And the Second Circuit addresses -- I apologize for not having dealt with this in more detail in the briefing, but there's a quote from the Second Circuit's decision in Ferguson, the 1992 --

THE COURT:  Yes.

MR. KRAUSE:  -- case says once it is shown that information was provided by a confidential source, the information itself is protected from disclosure despite the fact that there's no danger that the identity of the source could be divulged.

So it's a very broad proposition that once the information comes from a confidential source, that information is not subject to disclosure under 7(d).

THE COURT:  Let me just get Ferguson out.

MR. KRAUSE:  Sure.  And I know there are multiple Ferguson cases.  This is the 1992 Ferguson case.

THE COURT:  Right, right.

MR. KRAUSE:  And that's at page 1069.  That quote that

I just read is page 1069, right before subsection (C); so the very end of that discussion.  7(d) is concerned not with the content of the information, but with the circumstances -- I'm sorry, but only with the circumstances in which the information was obtained, and then the last sentence is the sentence I just read.

THE COURT:  Yes.

MR. KRAUSE:  I will say, your Honor, as plaintiffs pointed out in the briefing, there are a couple of instances where the FBI did try to release or, in fact, did release some information that was provided by sources that was very generic-type information.  I think the phrase in one of the documents was something about, word on the street was such and such.

My understanding there is that the FBI tried to release that information, in part, because there was a lot of information already in the public domain about this case.  Although, that, too, could have been withheld under this same principle, the second clause of 7(d).

THE COURT:  Ferguson was dealing with waiver.

MR. KRAUSE:  In part, yes.  I think we cite to Ferguson in the briefing on the waiver point.

THE COURT:  Right.

MR. KRAUSE:  And that's why -- I apologize.  I think we didn't really address this.

THE COURT:  No, and it may be that I ask you just to brief this particular issue a little bit more because I do really want to focus on where we draw the line.  So, you know, in a case where the information provided to the FBI would not reveal the identity of the source, when you infer that implied assurance of confidentiality attaches to the information.

I understand that the cases kind of talk about source and information together, as if it's the same thing, but I wonder if the rule was designed to protect the confidentiality of sources.  When you have a situation where you can assume that a source is a confidential source, but that there was no expectation of privacy in the information, if that should be analyzed differently, and I haven't seen a case that directly addresses that issue.

MR. KRAUSE:  Right.  I agree, your Honor.  I mean, that line from Ferguson, which I think is very broad language, seems to contemplate that the threshold question is does the information come from a confidential source, whether that source has confidentiality through express or implied assurance of confidentiality.  And if the answer to that is yes, if the information is provided by a confidential source, then the information is wholesale protected.  I understand your Honor's concern.

THE COURT:  But even if the source didn't expect to be confidential as to the information.  The source just maybe

K36PRAMO

doesn't want reprisal, doesn't want to get hurt, but there was no anticipation that the person would -- that the information would remain confidential.

It just goes to what the definition of a confidential source is, and what the expectation was, and could there be situations perhaps with respect to some of the witnesses in this situation, where the expectation was not that they would remain confidential for all purposes.

MR. KRAUSE:  I think I come back, and I've said this now already, but I think the notion is that the source doesn't necessarily have a complete expectation of confidentiality in the sense that the FBI agents to whom she gives the statements will never share that information with another FBI agent or with a prosecutor.  It's not in complete secrecy in that sense, but that the information would not go beyond the bounds of necessary law enforcement purposes.

THE COURT:  Right.

MR. KRAUSE:  I think that is sort of baked into the statutory language and baked into that second clause of 7(d) there.

THE COURT:  All right.  So let's talk a little bit about Nour Al-Khal, and it may be that you can't even answer the question definitively with respect to her, but she uses a pseudonym, and the fact that she provided information to law enforcement appears to already be known.

K36PRAMO

So why don't you address the issues with respect to her, how disclosing information that she allegedly provided to the FBI, assuming it doesn't reveal her identity, would put her or her family at risk of retaliation.

MR. KRAUSE:  Well, I believe Nour Al-Khal is her alias, if my understanding is right.

THE COURT:  Yes, that is the alias, that's the pseudonym, right.

MR. KRAUSE:  I believe that's correct.

Your Honor, I think certainly from the perspective of this person, assuming she had provided information to the FBI --

THE COURT:  Right.

MR. KRAUSE:  -- this was a person who was a victim of this crime.  I think the same concerns about risk of reprisal, based on what she would have been thinking at the time that she would have provided the information to the FBI, not necessarily based on what's happened since.

She's spoken about the ordeal that she experienced. She's spoken sort of obliquely about having spoken with members of law enforcement.  She's certainly -- there's no indication that I've seen that she's talked about actually having discussions with the FBI, let alone any of the substance of those discussions that she may have had with the FBI.  So I think the analysis is really no different for her.

K36PRAMO

THE COURT:  Wasn't there one -- at the Friedman declaration at Exhibit 4, at ECF page 3, I believe that she -- that in one of the public articles that there is an indication that she was interviewed by FBI agents after the attack.

MR. KRAUSE:  I mean, that's literally all it says.  It says:  After Mr. Vincent's death, Ms. Al-Khal said she was interviewed by FBI agents investigating his killing.

THE COURT:  Why does that not show that she never intended to remain a confidential source?  It could either go to waiver or it could go to the expectation of confidentiality.

MR. KRAUSE:  Well, I mean, just the mere fact that she may have had some discussion with the FBI, that's the extent of the -- first of all, that's the reporting in this article.  I mean, that's not even a statement that's coming from her directly, as we've seen in some of these audio recordings that were attached to the plaintiff's filing.  That's a statement attributed to her by a reporter.

I have no reason to believe that that's an accurate or inaccurate quotation, or it's not even a quotation, a characterization.  But for that statement alone to potentially constitute a waiver of what might be a broad swath of material pertaining to this person, who not only was somebody who spoke to the FBI, we would say with an implied assurance of confidentiality, but certainly the relation to the crime here. I mean, she was a victim of the crime, and would have had all

K36PRAMO

kinds of unique information to potentially provide to the FBI about that crime.

So this is not even a situation that's analogous to the first bucket of items that we were discussing, where the information would not be source identified. Very likely, if there is information in the FBI's files about this particular individual, it would very much be source identifying because it would speak to things that only someone who was present for some of these events could have known.

THE COURT: All right. Is there anything else you want to add today, Mr. Krause?

MR. KRAUSE: Not if your Honor doesn't have any other questions.

THE COURT: Okay. Thank you. I'll hear from plaintiff's counsel.

MR. RADINE: Thank you, your Honor. I can take these in reverse order, or any order that --

THE COURT: Sure. I mean, the question that I wanted to ask you with respect to Ms. Al-Khal is I had understood, and you'll correct me if I'm wrong, that the plaintiff helped bring her to the United States, that they lived together, that they're in touch?

MR. RADINE: Right.

THE COURT: And so if that's the case, can't she ask for a waiver of the information that she provided?

K36PRAMO

MR. RADINE:  That would have been very helpful.  Some years ago, Ms. Ramaci and Ms. Khal parted ways.  I believe that Nour is still in the country, but has just sought to start a new life elsewhere.  So we're not in touch with her, and I don't believe Ms. Ramaci is in touch with her.

THE COURT:  You don't think you can find her, to try and see if she'd be willing to waive any information, assuming that she provided it?

MR. RADINE:  Those efforts -- Mr. Friedman, who worked on the case before, can speak a little bit to that.

MR. FRIEDMAN:  Yes, your Honor, I sent her a couple of e-mails and left voicemails on the phone number that I had for her.  She just didn't respond to any of them.  My understanding is she lives in New Jersey --

THE COURT:  Okay.

MR. FRIEDMAN:  -- but doesn't want to participate.

THE COURT:  All right.  I understand you've made some effort, but it seems like, you know, this is a very important thing to your client, she wants to bring justice to her husband's murder, and it may be that something as simple -- she doesn't have to participate in the litigation, but as simple as a waiver, like a formal waiver, to the FBI may solve part of the problem here.

I mean, I don't know.  Maybe she's provided the information separately to your client, but I just am curious to

K36PRAMO

see that more of an effort hasn't been made to try and make that happen.

MR. FRIEDMAN:  The problem we had, your Honor, was she just simply didn't respond to anything.  So it's hard to -- short of trying to show up on her doorstep --

THE COURT:  Right.

MR. FRIEDMAN:  -- I didn't know what else I could do.

THE COURT:  Okay.  No, no, no.  I'm not placing blame as much as --

MR. FRIEDMAN:  I understand.

THE COURT:  -- suggesting you may want to ask your client if she's willing to reach out to her personally and see -- you know, maybe you could talk to Mr. Krause and ask if the FBI received a formal waiver from a witness -- and I understand the FBI can't, is not going to acknowledge one way or the other who made statements and who didn't, but to the extent that they got a waiver from a person, who had made statements, would they then be willing to provide the information.

MR. KRAUSE:  And, your Honor, we actually raised this issue at some point for the very same reason during, I don't remember if it was pre-briefing or during the briefing, but to basically say there is a mechanism by which a person who is identified in FBI records can waive their confidentiality or privacy right with respect to those records.

K36PRAMO

THE COURT:  So if you could provide the particular language.  I would just encourage you to talk to your client, maybe see if she's willing to reach out to her directly because that may get you some of the information you need.

MR. FRIEDMAN:  Thank you, your Honor.

THE COURT:  Please proceed.  Thank you.

MR. RADINE:  As to her expectation of privacy at the time, I'd point to evidence other than the article.  I'd point to the Exhibit 2, the NPR reporting.  It suggested both that she didn't have any expectation of privacy or of keeping her name safe, her identity safe.

Then, as to waiver, it also speaks to what she told the FBI.  So she explained in the recording that "I saw them, I heard them, I can recognize them," and for that reason, her life was already in danger.  These criminals, who had threatened her and knew her identity before the attack, are gunning for her, and they're not waiting to see if the FBI is going to prove that she gave some additional information that they may not have realized she received.

She referred to the way they talk and their voices, whether they seemed educated or cultured, but perhaps most important, is she gave the indication that she wanted these people caught, and she wanted to work with law enforcement to do it.  This is a near quote, it might be a bit of a paraphrase:  Actually, I wanted to get back -- as in back to

K36PRAMO

Iraq -- just to find the villains who killed Steven, but people advised me not to go and people said -- they assured me, people, law enforcement, will find them and bring them to justice they promised me. Then she says: Okay, I will take them at their words, and I will wait. They kept in contact with me from time to time, asking me about things, and they are still working on the case, and I am very grateful and thankful for them.

So that's around minute 27 on the Exhibit 2 recording.

THE COURT: Right.

MR. RADINE: That, to me, suggests far from having an expectation that her statement was being held confidentially. She wanted to work openly with the FBI.

THE COURT: Is it clear that the word "people" referred to the FBI?

MR. RADINE: I believe so. I believe that's who she is referring to. I don't think she had any other contacts. The FBI does speculate in their papers that, because she doesn't name the agency, that that's not clear. I can't imagine that makes any difference to the people who attacked her, whether it's the FBI or the CIA or the Postal Inspectors or whoever. They are people who have the capacity to bring trouble to their doorstep, and I think they're not going to be concerned which three-letter agency it is.

I also take from Ms. Ramaci's description of Nour's

time in the green zone, being held by the government with this extended period of multiple interrogations, that she's referring to those people who she's attempting to assist in this investigation, and I think that information again goes both to her expectation at the time and to any sense of waiver since then.  It's a plea for help that she captured these, as she said, villains with law enforcement, not something that she is hiding from.

THE COURT:  So just where on the audio recordings does it make clear that it's the FBI and not some other people?

MR. RADINE:  Well, I don't think she ever uses the letters FBI.  I think that she -- I'm not sure that a phrase is one that occurred to her necessarily.  But I think, from the context of the recording, it would be the much-harder-to-make inference that she would mean someone else.

As for law enforcement in the area, it's not going to be the Basra police, that's who picked her up or kidnapped her. It's -- to the extent that it could possibly mean the U.S. Army, I just don't see how that would change anything.

But again, as the FBI explained, a murder of a U.S. citizen in a non-military capacity is in the jurisdiction of the FBI.  So I guess what I mean is that, leaving aside her knowledge of how American law enforcement works, I think the context suggests that she means American law enforcement, whatever that particular form may be.

K36PRAMO

THE COURT:  All right.

MR. RADINE:  So I can turn, if you'd like, to the question of what information is withheld separate from the source, which is the first question your Honor asked, and as you alluded to even before that.  We don't -- we contest, of course, that those sources expected confidentiality in the first place, given that they were, you know, in a mass crowd in a public square.

But ultimately for us, what Ms. Ramaci wants to know is who killed her husband.  She wants to know for herself.  She wants to know for her lawsuit; so she can get some compensation for that.  We don't care precisely the form it comes in.  I would happily take it in the form of an FBI memo of conclusions.  I would take it in portions of witness statements.

The information can't stay protected forever because it initially had a relationship with a confidential source.  If a confidential source said, you know, well, it was a Tuesday, I don't think that the fact that the crime happened on a Tuesday is itself becomes a fact hidden forever from the public eye.

I believe the FBI would have made some conclusions. We get a little bit in Exhibit 16 on someone's discussion of what they heard on the street.  Given the fact that the closing memo itself is heavily redacted, that other discussions are redacted, that there would be conclusions from the FBI that

K36PRAMO

would, at that point, be unmoored from a confidential source, or to use the quote from Ferguson, information that would identify a confidential source.

I'll take an affidavit from the FBI right now, that they could write up and says the evidence suggests it's a Jaish al-Mahdi, that's a local group, is responsible for the attack given the information we have reviewed.

THE COURT:  Are you entitled to force the FBI to write an affidavit summarizing their findings?  Like, what's the basis for that?

MR. RADINE:  I just want to make their life easier. If they believe that there is nothing they can give me because everything they've learned is sort of this fruit of the poisonous tree in the form that they have it, then I'm just saying we'll take it in another form.  We are, you know, highly motivated to do whatever we can with the FBI to get Ms. Ramaci these answers.

And I don't think we need a tremendous amount of detail.  There are Iranian-affiliated groups, and having the identity of them would be helpful.  If, as in Exhibit 16, they believe it was Thar Allah, then that would be helpful, but they're sort of given as a street rumor.

THE COURT:  Why is the FBI not correct with respect to the question I asked about, does the source remain confidential, and if so, does that necessarily mean that the

K36PRAMO

information the source provided is confidential?

I don't know if I phrased that in the right way, but the issue I raised earlier.  When looking at 7(d), it refers to, in the last clause after the comma, information furnished by confidential source.

So as to the point I was asking about earlier, once the confidential source is determined to be confidential, doesn't that mean that all information, therefore, must be confidential as well?

MR. RADINE:  I just don't know where that concept stops.  I don't know to what extent the FBI can make use of information and have it still ultimately link back to a confidential source.  I don't know what it means if multiple sources give confirming information, if it takes on like a group confidentiality appearance.

Because we don't want any information that identifies the source at all, again, it doesn't matter the context in which I get it, so long as it's from law enforcement.  As in, if it's a conclusion drawn from multiple statements, at which point it surely is passed beyond a particular expectation that someone would have had in talking to the FBI, that works for us, too.

I understand that a witness statement, as an item, may remain confidential as a result, but it doesn't seem clear to me that every fact about the world that's included in that

K36PRAMO

statement is forever withhold-able.

THE COURT:  Okay.  All right.  Anything else?

MR. RADINE:  No, I think that's it.  I think we laid out everything else in our papers.  Mr. Friedman?

MR. FRIEDMAN:  Just one quick point, Judge.

THE COURT:  Sure.

MR. FRIEDMAN:  I apologize.  I know I'm here just sort of --

THE COURT:  That's all right.  Just bring the microphone closer so I can hear you.

MR. FRIEDMAN:  There was something that I heard Mr. Krause say before that just caught my attention.  He said that the statement that was released in Exhibit 16 to my declaration was something that could have been withheld pursuant to 7(d), but that the Bureau chose not to because so much was already known in the public sphere.

I don't understand how that would not apply to Ms. Al-Khal as well.  I don't know how much more could really be known in the public sphere about the attack provided by her that would, therefore, not apply to the -- you know, make this same standard, to the extent that this standard applies.

THE COURT:  Even if you're right as a practical matter in this case, doesn't the FBI have an interest in showing the world and showing future confidential sources that if we view you as a confidential source, we are going to keep your

K36PRAMO

information confidential unless you tell us otherwise?

MR. FRIEDMAN:  I think that would be something they would like, but I don't think that's what the FOIA statute provides.  I think the FOIA statute doesn't put the onus on the witness to say, explicitly, I don't want confidentiality.

THE COURT:  But if the circumstances lead one to imply confidentiality?

MR. FRIEDMAN:  Then I think the statute is plain on its face.  If the circumstances lead to that implication, that at the time the statements are given, the witness assumed that they would be kept confidential, then, yes, the FBI has an interest.

I just don't think they've made that case here, in light of Landano and the factors that the Supreme Court said should be considered, and we all agree that this is a terrorist attack.  I think that the FBI has decided, well, it's a terrorist attack and, therefore, anything anybody said must be implied to have been confidential.  I don't think that's appropriate.

I think there's still a proximity requirement, and that proximity is both, I think, spatial and familial.  And a lot of the cases that the FBI cites, or that Mr. Krause cites, relate to people whose proximity was that they were family members, or that they were somehow known to these gangs or to these violent criminals.

K36PRAMO

Here, we have a crowded marketplace in the middle of the day, as your Honor said. So proximity, to me, spatially, I don't see how that could apply unless there's something specific in the statement; you know, it was my shop; you know, I was standing at this specific point, and I knew that guy because he was my brother-in-law's friend.

But that's all missing from the Vaughn Index. I don't see any identifying -- any characterization that would make these comments subject to 7(d), these statements.

THE COURT: All right. Do you have any legal basis for the distinction that I'm pushing a little bit between expecting confidentiality with respect to your identity and with expecting confidentiality with respect to the information you provide? Do you think there's any legal basis for that distinction?

MR. FRIEDMAN: I can't think of a case off the top of my head, where it's broken down that closely. I think the fact that there are separate exceptions within the statute indicates that Congress considered that, right? 7(c) says the names come out and the addresses come out.

7(d) then goes farther and says, the whole statement must come out. So I think that anytime somebody speaks to the FBI, they know that their name is not supposed to released to the public, that it's in a file, or if they didn't know that, Congress contemplated that that should be the case barring

K36PRAMO

certain circumstances.  I think that covers that distinction.

THE COURT:  Okay.  All right.  Thank you.

MR. FRIEDMAN:  Thank you.

THE COURT:  Mr. Krause, do you want to respond to anything?

MR. KRAUSE:  Just a couple of points.

Mr. Friedman just said that the FOIA statute doesn't put the onus on the source to express a waiver of their confidentiality.  I think that's absolutely wrong.

I think, first of all, in the Second Circuit, that Ferguson decision, it's not clear to me that there even is a concept of waiver that applies in this circuit under 7(d), but when courts have discussed waiver, they talk about a source having had to show a manifest disregard for their confidentiality.  That's not something that is directed at the FBI.  That is, has the source indicated a manifest disregard for that confidentiality protection.  That's a DC Circuit phrase, and the FBI has picked that up, and it's even referenced in our declaration because it's something that the FBI deals with a lot in that jurisdiction.

This notion that -- for the relation to the crime piece of the Landano analysis requires there to be a type of familial relationship, that cannot be the case, your Honor.  The briefing in, I believe, the final brief, the plaintiff suggests it requires a closeness and/or frequent contact

between the source and the criminal, but that would mean that a pure eyewitness could never expect confidentiality, and forget about this is a terrorist attack, an abduction of an American citizen on the street in Iraq by a violent militia group, is certainly, I think as your Honor acknowledged at the top, the type of violent conduct people would expect or hope to have confidentiality if they're going to assist law enforcement.

THE COURT:  But aren't you going too far in assuming that with respect to any violent crime, that essentially means that anyone who provides information is assuming that their identities, information will remain confidential?

MR. KRAUSE:  No.  I don't think our argument has to go to that extreme, your Honor.  I don't think that it's every violent crime; although, I will say, in the Landano case itself, Justice O'Connor says most people would think that witnesses to a gang-related murder likely would be unwilling to speak to the Bureau except on the condition of confidentiality.

So I think even before discussing the nature of the crime versus the -- or in conjunction with the relation to it, I think that is contemplated, but not for every violent crime. There are certainly going to be violent crimes, there are lots and lots -- I don't have to tell your Honor, there are lots and lots of violent crimes that are committed, where there might not be the same type of fear of reprisal for witnesses.

But this is a particularly stark example of the type

K36PRAMO

of violent crime, where witnesses very much would have a reason to fear reprisal from the group that perpetrated this crime.

As to this notion that the FBI could just create an affidavit, I don't take Mr. Radine to be seriously suggesting that we do that, but just to be clear, that's certainly not contemplated by FOIA.  The FBI doesn't have to create any documents.  This is just about dealing with the material that's in documents that exist and the valid exemptions that can be taken by the agency in response to the FOIA request.

Unless your Honor has further questions, I don't have any other points to respond to.

THE COURT:  No.  Thank you.

MR. KRAUSE:  Thank you, your Honor.

MR. RADINE:  If I may?

THE COURT:  Yes, sure.

MR. RADINE:  I just wanted to say that I don't think the plaintiff has ever taken the position that there are dispositive factors for the relationship to the crime, such as a familial relationship or literal physical proximity to the incident.  It's, obviously --

THE COURT:  You feel like the government has not taken a particularized approach that's required by --

MR. RADINE:  The source-by-source basis, the particularized approach, right.  We have a crowded marketplace -- in Hale, the Tenth Circuit case in our brief,

the kidnapping murder, same set of crimes happened in a small town, where the Court noted everyone knew everyone. And even there, the Court wanted additional information from the government.

But here, in a crowded marketplace, where, according to Nour, a crowd had gathered around as she shouted out her name, address and threw down her ID card, that's in one of recordings, to try to get found, the idea that a person in that crowd would think, A, my giving information about a crime, a bunch of people are watching, would give me up; and then, B, that the criminals here know me, the idea that they would say, I do remember a guy in a green shirt 14 years ago, leaving aside even the time issue, even at that moment, that they would remember someone and know their identity and know how to find them, seems implausible.

And all that the government responds with is a speculation that a witness statement could say something like, I was standing in my shop, No. 14 whatever street, but that's their obligation to provide as evidence to the Court in a declaration. The records are in their possession. It's them who can see it and tell the Court there is information such that a witness' relationship to the crime would be evident enough to identify them.

There's nothing of that here. Same with the crowded street where Nour and Steven are thrown out of the vehicle, and

K36PRAMO

Nour says she spends ten minutes waiving down passing cars.

THE COURT:  All right.  Thank you.

MR. RADINE:  Thank you.

THE COURT:  All right.  So thank you all for your advocacy.  I'm not going to rule at this time, but again, I'm going to tell you what my thinking is and ask for some additional information.

So as an initial matter, I don't doubt for a minute that the FBI's motives are well intentioned, particularly given the violent nature of the crime involved and the risk of retaliation to sources.  I fully appreciate the importance of maintaining confidentiality as to the FBI's confidential sources in order to, both, protect those sources, as well as to encourage cooperation from others in future investigations.

But I am wondering if there might be more information that can be disclosed to Ms. Ramaci that doesn't jeopardize that confidentiality and so that she can attempt to bring her husband's killers to justice.

What I'm not yet sure of, based on the information that I have, is whether, because of the nature of the crime alone, all of the FBI sources assumed that their communications and cooperation with the FBI would remain confidential, in particular, with respect to information that does not reveal their identities.

So I'm concerned that the FBI may be taking an

approach that there's a blanket assumption of implied confidentiality where a violation crime is involved, and that confidentiality should be implied not only as to the source's identity but, therefore, to all of the information that the source provided.

So the information that I would like is twofold, or actually, threefold. So, first, as to the FBI's justifications for why the implied assurance of confidentiality attaches to these particular sources, assuming them to be of Nour Al-Khal and the bystanders to the crime. I've, obviously, read the Hardy declaration, but what I would like, either orally or in writing, is a more detailed description of who the sources are and what information we're talking about and why that information was assumed to be confidential, and I'm looking for the specific details explaining the FBI's reasoning as to the expectation of confidentiality for these particular sources.

I'm willing to have an *ex parte* conference to receive *ex parte* and/or classified submissions from the government, and you can redact the individual's names as well. But what I want is a more detailed explanation, an affidavit either from Mr. Hardy or from someone else at the FBI that speaks to these concerns. And, again, that can be classified, if need be.

Second, on the law, it would be helpful if each of the parties provided the Court with a letter addressing the issue that I have honed in on today as to why the information

K36PRAMO

provided to the FBI, where it doesn't reveal the source's identity, is or isn't covered by the implied assurance of confidentiality, and whether there's any way to make that distinction.

So assuming that I did find that there was an expectation of confidentiality with respect to the source, does that necessarily mean that all the information they provided was intended to remain confidential?  So any cases that you can cite or arguments you can make on that, and it can just be in letter form.

And I think, finally, what I'd like is I'd like plaintiff to go out again and try and reach Ms. Al-Khal and just inform me whether she has indicated -- to the extent she's even responded, whether she's indicated a willingness to waive confidentiality with respect to any information she may have provided the FBI.

How much time do you think you all need to provide those materials?  You can speak to each other, if you'd like, first.

MR. KRAUSE:  Your Honor, I think the most difficult part for us will be the declaration.

THE COURT:  Of course.

MR. KRAUSE:  And we can get that information together, but it might take a little bit of time.

THE COURT:  Okay.

K36PRAMO

MR. KRAUSE:  Can we have 30 days to do it?

THE COURT:  Sure, absolutely.

MR. KRAUSE:  I think that should be fine.  I'd like to confer with my client, but I think that 30 days may be sufficient.

THE COURT:  Okay.  And if you need a little more than that, let me know.

I may administratively stay the case pending the submission of the supplemental materials, but that won't have any effect on the speed that the case proceeds with at this point.

So why don't we say 30 days.  You'll get the submissions to me in 30 days.  If you need more time, because I understand that process with the FBI can be a complicated one, you'll let me know.

Any other applications at this time?

MR. RADINE:  No, your Honor.

MR. FRIEDMAN:  No, your Honor.

MR. KRAUSE:  No, your Honor.

THE COURT:  Okay.  Thanks.  Have a good weekend.  Stay healthy.

MR. FRIEDMAN:  You, too.

MR. KRAUSE:  Likewise.

(Adjourned)