```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 10/20/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LISA RAMACI,

                    Plaintiff,

            v.                                              No. 17-CV-10084 (RA)

FEDERAL BUREAU OF                                           OPINION & ORDER
INVESTIGATION,

                    Defendant.

RONNIE ABRAMS, United States District Judge:

        Plaintiff Lisa Ramaci filed this action against the Federal Bureau of Investigation (the

"FBI") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking access to

government records related to the August 2, 2005 kidnapping and murder of her husband, Steven

Vincent, in Basra, Iraq. Through a series of rolling productions, the FBI produced documents

responsive to Plaintiff's request, and withheld and/or redacted others based on several FOIA

exemptions. Now before the Court is the FBI's motion for summary judgment and Plaintiff's

cross-motion for summary judgment. The parties' dispute centers on the propriety of the FBI's

withholding of information pursuant to 5 U.S.C. 552(b)(7)(D)—which exempts from disclosure

certain law enforcement records containing information provided by "confidential source[s]"—

and in particular on the FBI's determination that the sources who provided information in

connection with the Vincent murder investigation did so with an implicit expectation of

confidentiality. Having reviewed the parties' submissions, as well as the Government's *ex parte*

filing that provides greater detail about its sources, the Court agrees that the FBI properly withheld exempted records. Accordingly, for the reasons discussed below, the FBI's motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied.

## BACKGROUND[1]

On August 2, 2005, Plaintiff's husband, the journalist Steven Vincent, and his Iraqi interpreter, Nour al-Khal,[2] were kidnapped from a public street in Basra, Iraq by a group of men in police uniforms. *See* Declaration of William A. Friedman ("Friedman Decl."), Dkt. 35, Ex. 3 at 4-5; Friedman Decl. Ex. 12 at 2. Vincent and al-Khal were then driven "to the outskirts of town," where they were "gagged," "beaten," and interrogated. *See* Friedman Decl. Ex. 3 at 4. After approximately six hours, at around midnight, they were driven to a different location in Basra, thrown out of the car, told to run, and shot at multiple times. *See id.*; Pl. Mot. at 1. Although Vincent died, al-Khal was shot three times but survived. Friedman Decl. Ex. 3 at 4; Friedman Decl. Ex. 8 at 2; Friedman Decl. Ex. 11 at 1. The FBI was subsequently notified of the death of an American citizen in Iraq, and the FBI's field office in Baghdad was charged with investigating the kidnapping and murder. *See* Pl. Mot. at 1. In 2008, the FBI closed its investigation. *See id.*; Friedman Decl. Ex. 1.

---

[1] The facts are drawn from the parties' submissions in support of and in opposition to the instant motions, including the Declaration of David Hardy, Dkt. 30 ("Hardy Decl."), submitted in support of the FBI's motion, as well as the documents attached as exhibits to Plaintiff's complaint. The Court has also reviewed the FBI's *ex parte*, in camera submissions made following oral argument. *See* Dkt. 52. "[T]he general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment, and Local Civil Rule 56.1 statements are not required." *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 44 n.11 (S.D.N.Y. 2018) (quoting *N.Y. Times Co. v. U.S. Dep't of Justice*, 872 F.Supp.2d 309, 314 (S.D.N.Y. 2012)). Although Plaintiff has not submitted a Rule 56.1 statement in support of her cross-motion, the Court overlooks this deficiency as there appears to be no material facts in dispute, and courts in this district have decided summary judgment cross-motions in FOIA cases even where the plaintiff did not submit a Rule 56.1 statement. *See, e.g.*, *N.Y. Times*, 872 F. Supp. 2d at 314; *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted).

[2] "Nour al-Khal" is a pseudonym. *See* Pl. Mot. at 1 n.1.

2

On September 9, 2016, Plaintiff, through her attorneys, submitted a FOIA request to the FBI, seeking "copies of all FBI holdings, including, without limitation, all documents, photographs and laboratory analyses related to the investigation into [Vincent's] abduction and murder." Hardy Decl. ¶ 6; Compl. Ex. A. On September 23, 2016, the FBI advised Plaintiff that "unusual circumstances" applied to the processing of her request, and offered her the opportunity to reduce the scope of the request. Hardy Decl. ¶ 8; Compl. Ex. C. In a separate letter dated September 23, 2016, the FBI also informed Plaintiff that it had located approximately 3,362 pages of records potentially responsive to her request. Hardy Decl. ¶ 9; Compl. Ex. D.

On February 7, 2017, in response to a request for a status update, the FBI informed Plaintiff that reducing the scope of her request "may accelerate the processing and allow for a more timely receipt of the information" she sought. *Id.* ¶ 12. On February 13, 2017, Plaintiff's counsel and an FBI representative had a telephone conversation, during which Plaintiff agreed to align her FOIA request with that of another FOIA requester who submitted an earlier request for "the closing memorandum of the murder investigation of Steven Vincent" and "a specific serial describing the investigation." *Id.* ¶ 13; Compl. Ex. H. As the FBI explained, this agreement reduced the volume of potentially responsive records from approximately 3,362 pages to approximately 116 pages, which would reduce the request's processing time. *Id.* Between April and December 2017, however, the FBI's estimates of how long it would take to process Plaintiff's request continued to grow. *See* Hardy Decl. ¶¶ 14-20.

Plaintiff filed this action on December 26, 2017. Dkt. 1. An amended complaint—the operative complaint—was filed the next day. Dkt. 5. On February 28, 2018, the FBI made an "interim release of records" to Plaintiff, whereby it reviewed 114 pages of responsive records, released 89 pages in full or in part, and withheld 25 pages in full under certain FOIA exemptions.

Hardy Decl. ¶ 22. Pursuant to the parties' agreement for the FBI to review, process, and release documents on a rolling basis, the FBI made nine further productions of documents to Plaintiff between April 2018 and December 2018. *See* Hardy Decl. ¶¶ 23-32. On December 28, 2018, the FBI advised Plaintiff that it had "completed processing all the outstanding consultations." Hardy Decl. ¶ 32. In total, the FBI produced 2,571 pages of responsive records to Plaintiff, as well as one video. Hardy Decl. ¶ 4.

The FBI moved for summary judgment, Dkt. 28, arguing in relevant part that the agency properly withheld information provided by its sources under an implied assurance of confidentiality—that is, "with an understanding that the communication[s] would remain confidential," Dkt. 29 at 6 (quoting *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993)). The FBI's principal contention is that, given the violent nature of the crime it was investigating and its sources' unique perspectives on that crime, the FBI reasonably inferred that the sources would not have provided information to the investigators absent an implied assurance that their identities and information would be kept secret. Plaintiff filed an opposition and cross-motion for summary judgment, Dkt. 33, arguing that the FBI failed to establish that the sources in question provided their statements with an implied guarantee of confidentiality, Dkt 34. The FBI filed an opposition to Plaintiff's cross-motion and a reply in further support of its motion, Dkt. 38, and Plaintiff filed a reply in further support of her cross-motion, Dkt. 39.

The Court held oral argument on the parties' motions. *See* Oral Argument Transcript, Dkt. 45 ("Oral Arg. Tr."). At the conclusion of argument, the Court requested an additional submission from the FBI, including an *ex parte* or classified submission if necessary, that provides "the specific details explaining the FBI's reasoning as to the expectation of confidentiality for [its] particular sources." Oral Arg. Tr. at 29. The Court also suggested that

Plaintiff make an additional attempt to reach al-Khal to see if she has "indicated a willingness to waive confidentiality with respect to any information she may have provided the FBI." *Id*. The Court stayed the action pending receipt of the supplemental submissions and its ruling on the pending motions. Dkt. 42. The FBI subsequently submitted an *ex parte* declaration to provide further support for its position that it properly withheld information provided by individuals pursuant to an implied assurance of confidentiality, and a classified exhibit to that declaration containing the underlying documents at issue. *See* Dkts. 52, 53. The parties also submitted supplemental briefs, *see* Dkts. 54, 55, and Plaintiff submitted declarations attesting that she was unsuccessful in reestablishing contact with al-Khal.

## LEGAL STANDARDS

### I.     FOIA

Under FOIA, federal agencies are required to make records available to the public upon request. *See* 5 U.S.C. § 552(a). The statute is "broadly intended to permit citizens access to information in the possession of the federal government that is unnecessarily sheltered from public view," and "emphasizes a preference for the fullest possible agency disclosure of such information consistent with a responsible balancing of competing concerns included in nine categories of documents exempted from the Act's disclosure requirements." *Halpern v. FBI*, 181 F.3d 279, 284 (2d Cir. 1999) (citing *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754-55 (1989)); *see also Ortiz v. U.S. Dep't of Health & Human Servs.*, 70 F.3d 729, 732 (2d Cir. 1995) ("FOIA embodies a policy of encouraging public scrutiny of government agencies by permitting broad access to records and other information.") (citing *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-62 (1976)). As the Second Circuit has explained, the statute "is to be construed broadly to provide information to the public in accordance with its purposes," while "the exemptions from production are to be construed

narrowly." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (citation

omitted); *see also Ortiz*, 70 F.3d at 732 ("Courts must construe FOIA's statutory exemptions

narrowly in favor of disclosure.") (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152

(1989)); *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016) (noting that "doubts as to the

applicability of [an] exemption must be resolved in favor of disclosure").

## II.    Summary Judgment Standard in FOIA Cases

"FOIA cases are generally resolved on motions for summary judgment." *New York Times

Co. v. United States Secret Serv.*, No. 17 CIV. 1885 (PAC), 2018 WL 722420, at *3 (S.D.N.Y.

Feb. 5, 2018). "In order to prevail on a motion for summary judgment in a FOIA case, the

defending agency has the burden of showing that its search was adequate and that any withheld

documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807,

812 (2d Cir. 1994) (citations omitted); *see Ortiz*, 70 F.3d at 732 ("In FOIA cases, the government

bears the burden of establishing that any exemption from disclosure applies.") (citing 5 U.S.C. §

552(a)(4)(B)). The government agency can sustain its burden through "[a]ffidavits or

declarations supplying facts indicating that the agency has conducted a thorough search and

giving reasonably detailed explanations why any withheld documents fall within an exemption."

*Carney*, 19 F.3d at 812 (citations omitted). Such affidavits or declarations are "accorded a

presumption of good faith," *id.*, and are sufficient where they are "not controverted by either

contrary evidence in the record nor by evidence of agency bad faith," *Ctr. for Constitutional

Rights v. CIA*, 765 F.3d 161, 166 (2d Cir. 2014) (quoting *Wilner v. Nat'l Sec. Agency*, 592 F.3d

60, 73 (2d Cir. 2009)); *see also Grand Cent. P'Ship*, 166 F.3d at 478 ("A district court in a FOIA

case may grant summary judgment in favor of an agency 'on the basis of agency affidavits if

they contain reasonable specificity of detail rather than merely conclusory statements, and if they

are not called into question by contradictory evidence in the record or by evidence of agency bad

faith.'") (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)). The agency's justifications are sufficient if they appear "logical and plausible." *ACLU v. U.S. Dep't of Def.*, 901 F.3d 125, 133 (2d Cir. 2018), *as amended* (Aug. 22, 2018) (citation omitted). Thus, "where the agency's submissions are adequate on their face, district courts may forgo discovery and award summary judgment on the basis of affidavits." *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F. Supp. 3d 27, 44 (S.D.N.Y. 2018) (internal quotation marks and citations omitted).

District courts also have broad discretion in deciding whether to require an agency to further justify its withholdings through *in camera* review. *See Associated Press v. U.S. Dep't of Justice*, 549 F.3d 62, 67 (2d Cir. 2008). District courts are authorized under 5 U.S.C. § 552(a)(4)(B) "to conduct *in camera* review of disputed documents to determine whether the documents, in whole or part, are properly withheld under a FOIA exemption." *Id*. Although such review is "necessary" only where "the government's affidavits make it effectively impossible for the court to conduct de novo review of the applicability of FOIA exemptions," *id.*, as a general matter "the propriety of such review is a matter entrusted to the district court's discretion," *Loc. 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988).

## DISCUSSION

The FBI argues that it properly withheld records and portions of records responsive to Plaintiff's FOIA request pursuant to Exemptions 5, 6, 7(C), 7(D), and 7(E), and is therefore entitled to summary judgment. The instant dispute primarily concerns the FBI's withholding of 632 pages of records pursuant to an implied assurance of confidentiality under Exemption 7(D), 5 U.S.C. § 552(b)(7)(D). *See* FBI Mot., Dkt. 29, at 4; Pl. Mot., Dkt. 34, at 3 n.4.[3]

---

[3] Plaintiff makes clear that she is only challenging withholdings under Exemption 7(D) to the extent they are based on an implied, rather than an express, assurance of confidentiality. She does not challenge any statements provided to the FBI pursuant to an express guarantee of confidentiality. *See* Pl. Mot. at 3 n.4. Nor does she challenge that the documents at issue were "compiled for law enforcement purposes" and thus meet the threshold requirement of

## I.      Exemption 7(D)

Exemption 7 "provides that certain law enforcement records are exempt from disclosure" under FOIA. *Ortiz*, 70 F.3d at 732. Exemption 7(D), in particular, "permits the Government to withhold 'records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation . . . , information furnished by a confidential source.'" *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (quoting 5 U.S.C. § 552(b)(7)(D)). Exemption 7(D) "is meant to (1) protect confidential sources from retaliation that may result from the disclosure of their participation in law enforcement activities, and (2) encourage cooperation with law enforcement agencies by enabling the agencies to keep their informants' identities confidential." *Grand Cent. P'ship*, 166 F.3d at 487 (quoting *Ortiz*, 70 F.3d at 732).

The threshold question under Exemption 7(D) "is not whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential." *Landano*, 508 U.S. at 172 (emphasis in original). *See also Ferguson v. FBI*, 957 F.2d 1059, 1069 (2d Cir. 1992) ("Exemption 7(D) is concerned not with the content of the information, but only with the circumstances in which the information was obtained."). If the government establishes that "information was provided by a confidential source, the information itself is protected from

Exemption 7. *See* FBI Mot. at 7-8. Furthermore, she does not challenge the adequacy of the FBI's search for responsive records, or the withholding of any information by any government agency other than the FBI. *See* Dkt. 24. As discussed more below, she also does not challenge any withholdings based on Exemptions 5, 6, 7(C), or 7(E).

disclosure," even where there is "no danger that the identity of the source could be divulged." *Id*. "The statutory language"—which exempts from disclosure "information furnished by a confidential source" contained in a record "compiled by criminal law enforcement authority in the course of a criminal investigation"—"does not leave room for a judicial balancing of the equities, or for a determination of whether any harm would result from disallowing an exemption." *Id*.

A source can be deemed confidential in one of two ways. Either the source was willing to speak with the government only because of an express promise of confidentiality, or the source provided information "in circumstances from which such an assurance could be reasonably inferred," *i.e.*, with an implied assurance of confidentiality. *Landano*, 508 U.S. at 172 (citation omitted). In *Landano*, the Supreme Court confronted the question of how the government can meet its burden of showing that an implied assurance of confidentiality should be inferred. "A source should be deemed confidential," the Supreme Court stated, "if the source furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *Id*. at 174. Although such confidentiality may be expected by "many, or even most, individual sources" who speak with the FBI, the Supreme Court rejected the government's argument that an implied assurance of confidentiality could always be inferred from the fact that a source cooperated with the FBI during a criminal investigation. *Id*. at 176. Instead, the Supreme Court adopted a "particularized approach" to the application of Exemption 7(D), placing special emphasis on two factors: "the character of the crime at issue" and "the source's relation to the crime." *Id*. at 179-180; *see also id.* at 174; *Dent v. Executive Office for U.S. Attorneys*, 926 F. Supp. 2d 257, 263 (D.D.C. 2013) ("[A] source's confidentiality must be determined on a case-by-case basis."). *Landano* suggests

that "an inference of implied confidentiality would be appropriate with respect to informants who, absent confidentiality, might be worried about possible retaliation because of the subject matter." *Halpern*, 181 F.3d at 299. For that reason, courts are more willing to infer confidentiality in cases where the crimes at issue are particularly violent. *See Landano*, 508 U.S. 179 ("Most people would think that witnesses to a gang-related murder likely would be unwilling to speak to the Bureau except on the condition of confidentiality."); *Hale v. U.S. Dep't of Just.*, 99 F.3d 1025, 1031 (10th Cir. 1996) (noting that "unusually cruel or gruesome crimes of violence" may "indicat[e] a propensity on behalf of the perpetrator for potential violence against the source."). And courts are similarly more willing to infer confidentiality where "sources were close enough to [the] activities to provide detailed and singular information about them," *Dent*, 926 F. Supp. 2d at 271, since such singular information, if disclosed, could be reasonably traced back to the source. In making its case that its sources provided information based on an implied promise of confidentiality, "[t]o the extent that the Government's proof may compromise legitimate interests, of course, the Government still can attempt to meet its burden with *in camera* affidavits." *Landano*, 508 U.S. at 180.

The FBI contends that "an implied assurance of confidentiality should be inferred" for its sources from the Vincent investigation "in light of the violent nature of the crime and the risk of retaliation or reprisal for those who assisted the FBI, as well as the fact that the specific information withheld from certain records would effectively reveal the identities of the sources to those familiar with the events addressed in those records." FBI Mot. at 1-2. Its *ex parte* submissions further detail the context in which its sources provided information to the FBI. Plaintiff argues that the FBI's redactions are "based upon a blanket application of FOIA's Exemption 7(D), conferring upon nearly every witness who provided a statement an implied

guarantee of confidentiality," and that such "blanket withholdings are especially inappropriate given the unique facts at issue here." Pl. Mot. at 2-3. She specifically raises challenges to the FBI's withholding of records containing information that she assumes was provided by two categories of sources: (1) Nour al-Khal, Vincent's Iraqi interpreter, and (2) other Iraqis who witnessed the crime. The Court will address each of these challenges in turn.

### A.  Statements that Nour al-Khal May Have Provided to the FBI

Plaintiff first argues that any information that may have been provided to the FBI by Nour al-Khal—a victim and first-hand witness to the crime—could not have been properly withheld under Exemption 7(D), as al-Khal was "never under the impression or belief that her statements would be kept confidential or, even [if she] was, she has waived such confidentiality." Pl. Mem at 10.

The Court disagrees. As an initial matter, it is plain that, assuming Plaintiff is correct that al-Khal provided information to the FBI, she would meet the general criteria for finding that she was an impliedly confidential source under the "two key factors" discussed by the Supreme Court in *Landano*: "the nature of the crime that was investigated and the source's relation to it." *Halpern*, 181 F.3d at 299. Plaintiff does not dispute that the nature of the crime—a kidnapping and murder perpetrated by a terrorist group—weighs in favor of finding an implied assurance of confidentiality. *See* Pl. Reply at 3. As the FBI explains, Vincent's kidnapping and murder "occurred in the war-torn country of Iraq that was, at the time, plagued with ethnic and religious violence between the Iraqi government and the United States and Coalition forces and multiple insurgent groups," Hardy Decl. ¶ 41, and the perpetrators of the crime "clearly belong[ed] to a violent group willing to commit violence," Hardy Decl. ¶ 44. In the FBI's experience, "individuals who cooperate with law enforcement during the investigation of crimes potentially

committed by violent militias and/or terrorist groups face potential retaliation or harm for any assistance provided to the investigators," which is not limited to the source of that information, but indeed may extend to "the source's family and friends to send a message to future potential sources to deter cooperation with FBI investigators." *Id*.

Second, al-Khal's "relation to the crime" also supports a finding of implied confidentiality. "With respect to the source's relation to the crime, [the court asks] whether there is something unique to a particular source that would reasonably make that source feel particularly at risk of retribution for providing information to the FBI over and above the generalized apprehension that every citizen must experience when providing information to the FBI pertinent to criminal activity." *Hale*, 99 F.3d at 1032. It is reasonable, for instance, that "a person who was involved in the underlying events" of the crime being investigated would expect his or her identity and information to be kept confidential by the FBI. *Id.* (citing *Landano*, 508 U.S. at 179). Here, the FBI persuasively notes, as a victim of the crime under investigation, al-Khal "would have been in a unique position to provide assistance to investigators regarding details of the attack on her and Mr. Vincent," which would lead to "a substantial risk that disclosure of any information she may have provided to the FBI would be easily traceable to her." *See* FBI Reply at 5. In fact, she likely "would know better than anyone what the perpetrators were capable of, and what harm they might seek to inflict on her, her family, or her friends if any potential cooperation with law enforcement officials were to be revealed." *Id.*

Exemption 7(D) was intended to protect individuals who provide information under such circumstances. *See, e.g.*, *Ortiz*, 70 F.3d at 732; *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1329 (D.C. Cir. 2000) ("We have . . . identified the crimes of 'rebellion or insurrection, seditious conspiracy, and advocating overthrow of the government' as serious offenses that, when

undertaken by a criminal enterprise with a record of violence, warrant the inference that an informant expects confidentiality.") (quoting *Williams v. FBI*, 69 F.3d 1155, 1159-60 (D.C. Cir. 1995)); *Hale*, 99 F.3d at 1031 (noting as further examples "a crime taking place within some other potentially violent organizational context, as for example a cult or an extremist group," "a series of repetitive premeditated crimes of violence," "unusually cruel or gruesome crimes of violence indicating a propensity on behalf of the perpetrator for potential violence against the source," and "circumstances involving actual threats of retaliation or harassment against the source or others similarly situated") (citing *Williams*, 69 F.3d at 1159 and *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1063 (3d Cir. 1995)). That al-Khal fled Iraq following the attack and has specifically articulated a fear of returning to Iraq bolsters the conclusion that any information she may have provided the FBI would have been impliedly confidential. *See, e.g.*, Friedman Decl. Ex. 10 at 2 ("If I go back to Iraq 100 percent I could get killed."); Friedman Decl. Ex. 4 at 2 ("Worrying that the men who had killed Mr. Vincent would kill her, too, she left Basra for Baghdad and Kurdistan."); Friedman Decl. Ex. 8 at 3 ("She still plans, when it's safe, to return to Basra.").

In resisting the conclusion that al-Khal, to the extent she spoke with the FBI, would be a "confidential source," Plaintiff relies on the fact that al-Khal provided public statements to the media regarding Vincent's kidnapping and murder and, in doing so, "never provided any indication that she believed her statements to the FBI were confidential." Pl. Mot. at 3. Plaintiff has submitted several news articles and audio recordings in connection with her cross-motion, purportedly demonstrating the extent to which al-Khal has publicly discussed the events of the kidnapping and murder. *See* Friedman Decl. Exs. 2-12. Based on these examples, Plaintiff argues, it is "highly unlikely" that al-Khal would have spoken to the FBI with an expectation that

her involvement in the investigation would be kept confidential. *See* Pl. Mot. at 10.

The Court disagrees. That al-Khal spoke publicly about the kidnapping and murder—using an alias—does not mean that an implied assurance of confidentiality could not attach to any conversations she may have had with the FBI. As an initial matter, a review of the materials attached to the Friedman Declaration demonstrates that, while she discussed her experience in various public settings, there is little indication in these public materials that al-Khal ever stated that she was cooperating with the FBI (or any other law enforcement agency) or that she was providing any confidential non-public information to such agencies. The one reference to the FBI in the materials submitted with Plaintiff's cross-motion merely states that, after Vincent's murder, al-Khal was "interviewed by F.B.I. agents investigating his killing." Friedman Decl. Ex. 4 at 2. But that one sentence is immediately followed by the statement that "soon . . . she was on her own," *id.*, and, contrary to Plaintiff's suggestion, this brief reference does not establish that al-Khal actually provided information to or publicly discussed her "work with the FBI." Pl. Reply, Dkt. 39, at 2. As noted by the FBI, "Aside from one fleeting reference in a newspaper article reporting that Ms. al-Khal was interviewed by the FBI—with no indication about what she may or may not have said during this interview, or the degree to which she may or may not have assisted the investigation . . . —there is no mention in any of the cited materials of any interaction between Ms. al-Khal and the FBI." *See* FBI Reply, Dkt. 38, at 6. The audio recording of "One Iraqi Refugee" that Plaintiff cites several times, which aired on an American Public Media program in February 2007, *see* Friedman Decl. Ex. 2, also does not reveal any information about the specific law enforcement agencies that al-Khal may have been in contact with, or what information she may have shared with those agencies. At most, al-Khal merely stated on that program that "people" advised her not to return to Iraq to find her abductors,

"people" assured her that "they would find them and bring them to justice," and that these "people" kept in contact with her, asked her about certain information from time to time, and were potentially "still working on the case." *See* Friedman Decl. Ex. 2 at 27:10-28:01. Although Plaintiff contends that al-Khal "spoke of her cooperation with law enforcement" during this interview, al-Khal's vague references to "people" who may "still [be] working on the case" does not establish that al-Khal cooperated with law enforcement agencies or that, to the extent she did, she did not expect confidentiality when talking to the "people" mentioned. Moreover, even if her public statements could be fairly read as having disclosed general cooperation with the FBI, there is no evidence that she publicly disclosed any information about what she may have provided to the agency. The Court is not persuaded that a person who, in an interview using an alias, has disclosed only the fact of his or her cooperation with law enforcement could not have simultaneously had an expectation that the details of his or her conversations with law enforcement would remain confidential.

The FBI's reasoning, as set forth in the Hardy Declaration, further bolsters a finding of an implied assurance of confidentiality with respect to any information that may have been provided by al-Khal. The FBI has inferred an implied assurance of confidentiality for information provided by certain sources based on the "circumstances surrounding these individuals' assistance, the risks they likely faced based on their assistance to the FBI, and the singular nature of the information they provided." Hardy Decl. ¶ 40. Indeed, the relevant inquiry is not "whether release of the information" Plaintiff seeks "will reveal the source" of that information, but rather, "whether there was an implied agreement of confidentiality given when the source provided the information to the government investigators." *Hale*, 99 F.3d at 1033. Based on the nature of the crimes here, al-Khal's relation to the crimes, and the risks that al-Khal might face if her identity

and any information she may have provided were disclosed, the Court finds that any information al-Khal may have provided to the FBI would have been given with an expectation of confidentiality.[4]

Alternatively, Plaintiff argues that even if al-Khal did provide statements under an implied assurance of confidentiality, she nonetheless waived that confidentiality by making public statements about the incident. *See* Pl. Mot. at 10. According to the Hardy Declaration, the FBI recognizes a waiver of implied confidentiality only where there is "solid evidence that the source has manifested complete disregard for confidentiality." Hardy Decl. ¶ 45. *Accord Davis v. Fed. Bureau of Investigation*, No. 18-CV-0086 (CRC), 2019 WL 2870729, at *8 (D.D.C. July 3, 2019) ("Once an agency establishes either an express or implied grant of confidentiality, a FOIA requester can overcome that only by providing absolutely solid evidence showing that the source has manifested complete disregard for confidentiality.") (quotation marks and alteration omitted). Plaintiff contends that "solid evidence" showing that al-Khal has "manifested a complete disregard for confidentiality" is present here in light of the "collection of print articles, television and radio interviews and public speeches" that al-Khal gave between 2007 and 2013, "including revealing that she was working with law enforcement as to the attack." Pl. Mot. at 10.[5]

---

[4] Although Plaintiff also mentions that she was "directly involved in efforts" to bring al-Khal to the United States and that she and al-Khal lived together in her apartment "for several years," *see* Pl. Mot. at 10, it is unclear how either of these factors bears in any way on whether al-Khal provided statements to the FBI under an implied assurance of confidentiality. Indeed, as the FBI points out, "[t]he fact that Ms. al-Khal was (or is) closely connected to the Plaintiff does not suggest that she would not have had an expectation of confidentiality for any dealings with the FBI, nor does the relationship between the two women add to the totality of what is in the *public* domain regarding Ms. al-Khal and the FBI." FBI Reply at 6 n.1.

[5] Plaintiff again cites the audio recording of "One Iraqi Refugee," Friedman Decl. Ex. 2 at 27:10-28:01, to support her claim of waiver. But as discussed above, this recording does not show that al-Khal publicly discussed any cooperation with the FBI or what information she may have provided, let alone that al-Khal has "manifested complete disregard for confidentiality."

The Court agrees with the FBI that al-Khal has not waived any implied assurances of confidentiality, finding that her subtle and passing references to having spoken with law enforcement (in conversations where she was using an alias) do not amount to a total disregard for any and all confidentiality she may have expected from those purported conversations. The Second Circuit has rejected the idea "that subsequent disclosures of the identity of a confidential source or of some of the information provided by a confidential source requires full disclosure of information provided by such a source." *Ferguson*, 957 F.2d at 1068. *See also Kuzma v. U.S. Dep't of Justice*, 692 F. App'x 30, 36 (2d Cir. 2017) (upholding the FBI's nondisclosure under Exemption 7(D) and rejecting assertion that individuals allegedly involved in the case had been officially confirmed as confidential informants through their testimony in open court); *Heimerle v. U.S. Dep't of Justice*, No. 83 Civ. 1994 (MEL), 1985 WL 372, at *3 (S.D.N.Y. Mar. 5, 1985) ("[T]he assurance of confidentiality is not waived once information withheld under Exemption 7(D) appears in the public domain. The exemption remains in force until such time as the beneficiary of the promise of confidentiality waives disclosure."). The fact that the existence of a confidential conversation with law enforcement may have been disclosed hardly suggests that the substance of that conversation should now be public information.

Courts outside of this Circuit have likewise rejected similar arguments of waiver, even where the source's identity becomes known to the public. *See, e.g.*, *Neely v. FBI*, 208 F.3d 461, 466 (4th Cir. 2000) ("[T]he statute by its terms does not provide for such waiver. Rather, once the prerequisites of a 'confidential source' and a record compiled 'in the course of a criminal . . . investigation' are satisfied, Exemption 7(D) protects from disclosure 'information furnished by [that] confidential source.'") (citation omitted); *Kimberlin v. Dep't of Treasury*, 774 F.2d 204, 208-09 (7th Cir. 1985) ("Assuming *arguendo* that this information was in fact disclosed, this

disclosure did not waive any claims of confidentiality under FOIA. The disclosure of information given in confidence does not render non-confidential any of the information originally provided."); *Lame v. U.S. Dep't of Justice*, 654 F.2d 917, 925 (3d Cir. 1981) ("Since all the information given by a confidential source is exempt, it follows that the release of a portion of such information does not lift the blanket exemption. Courts have consistently held that the subsequent disclosure of information originally given in confidence does not render non-confidential any of the information originally provided."); *Cobar v. U.S. Dep't of Justice*, 81 F. Supp. 3d 64, 72-73 (D.D.C. 2015) ("[P]ublic testimony by 'confidential sources' does not waive the FBI's right to invoke Exemption 7(D) to withhold the identity of a confidential source.") (quoting *Parker v. Dep't of Justice*, 934 F.2d 375, 379-380 (D.C. Cir. 1991)); *Reiter v. Drug Enf't Admin.*, No. Civ.A. 96-0378 RMU, 1997 WL 470108, at *6 (D.D.C. Aug. 13, 1997), *aff'd*, No. 97-5246, 1998 WL 202247 (D.C. Cir. 1998)) (explaining that "once an informant's confidentiality has been established, almost nothing can eviscerate Exemption 7(D) protection," and that "an agency may continue to withhold information from a source even after the source has been revealed to the requester or when the requester knows the source's identity").

Based on the circumstances articulated above, the logical inference is that any information given to the FBI by al-Khal—the surviving victim of a brutal crime—would have been provided with an expectation of confidentiality within the meaning of Exemption 7(D).

### B.  Information Provided by Other Iraqi Witnesses

Plaintiff also argues that statements provided by other Iraqi sources have been improperly withheld under Exemption 7(D) because such individuals likely "witnessed the kidnapping during daylight in a crowded marketplace in a city of approximately 1.6 million people" and therefore "would likely not worry that the perpetrators could ever work out their identities from

18

their (anonymized) statements." Pl. Mot at 3; *see also* Pl. Reply at 1-2 (suggesting that the Iraqi witnesses "were presumably unidentifiable bystanders in a crowded marketplace"); *id*. at 3 (arguing that witnesses who were "bystanders in a busy marketplace, unknown to the perpetrators" would not expect confidentiality in relating what they saw to the FBI). Put another way, although Plaintiff does not dispute the violent nature of the crime or the general threat to cooperators with the United States Government in Iraq circa 2005, Plaintiff contends that mere bystanders to a crime do not possess the necessary closeness to the criminal activity to benefit from an implied assurance of confidentiality. Because Plaintiff assumes that "unidentifiable bystanders" are the types of sources at issue here, Plaintiff infers that the FBI is performing a blanket withholding of information based solely on the violent nature of the crime, and argues that this is impermissible. *See* Dkt. 55 ("Pl. Supp. Br.") at 2-3 (quoting *Sennett v. Dep't of Just.*, 962 F. Supp. 2d 270, 286 (D.D.C. 2013) ("While the FBI has explained the character of the crime at issue, . . . [a]t a minimum, there *must* be some mention of the source's relation to the crime.") (emphasis in Plaintiff's letter); *but see Mays*, 234 F.3d at 1330 ("[W]hatever his 'relation to the crime,' an informant is at risk to the extent the criminal enterprise he exposes is of a type inclined toward violent retaliation.").

Plaintiff's arguments are thoughtful and well-taken, and her assumptions about the nature of the witnesses are understandable given the lack of law enforcement information available to her. The Hardy Declaration did not provide particularly extensive details regarding the nature of the witnesses or their relations to the crime—only that the FBI "interview[ed] multiple Iraqi citizens who provided information that was singular in nature, and if released, could reveal their identities," Hardy Decl. ¶ 41, and that "the sources, based on their proximity to the crime, were privy to specific and singular information about the potential criminal/terrorist activities under

investigation," *id*. ¶ 44. Partly on the basis of this lack of specificity, but without suggesting that the FBI's public submissions were necessarily insufficient, the Court at oral argument directed the FBI to produce "a more detailed description of who the sources are," including "the specific details explaining the FBI's reasoning as to the expectation of confidentiality for these particular sources." Oral Arg. Tr. at 29. Plaintiff has asked that the Court "probe whether that submission is detailed enough to infer confidentiality of each source." Pl. Supp. Br. at 3.

Having conducted that *in camera* review, the Court is now confident that the FBI's inferences of implied confidentiality, and therefore its withholdings pursuant to Exemption 7(D), were proper, based not only on the violent nature of the crime and the threats faced by Iraqis willing to assist U.S. personnel, *see* Hardy Decl. ¶ 41, but also because of the relation of each of the FBI's sources to the crime.[6] The Government's *ex parte* submission provides substantial support for the Hardy Declaration's statement that each of the individual sources in this case "provided information that was singular in nature." *Id*. ¶ 44. The FBI's witnesses were not merely unidentifiable bystanders to a daytime kidnaping in a crowded marketplace—each of the sources whose information was withheld pursuant to Exemption 7(D) had a particular vantage point on the circumstances and provided information that the FBI reasonably concluded could, if disclosed, be traced back to the sources, thus revealing their cooperation and implicating their safety. The witnesses' unique perspectives were informed by either their position in a relevant community, their specific knowledge about the victims and/or possible perpetrators of the crime,

---

[6] Because the Court finds that these witnesses were implied confidential sources based on *both* the nature of the crime *and* the sources' particular relation to it, it need not decide whether, as Plaintiff argues, "unidentifiable bystanders" to a violent crime could not properly be deemed implied confidential sources, or whether, as the FBI argues, "[t]he abduction and murder of Mr. Vincent is the type of crime that, even without more, warrants an inference that any witnesses who provided information to the FBI did so with the expectation of confidentiality." FBI Reply at 11. As discussed above, the record does not support a finding that these witnesses were mere bystanders in a crowded marketplace, and supports the FBI's assertion that the sources provided specific and singular information.

or their interactions with the victims and/or possible perpetrators of the crime. These specific

connections could allow the sources' identities to be inferred from the information they provided,

thus exposing them to threats of retaliation. *See Labow v. U.S. Dep't of Justice*, 831 F.3d 523,

531 (D.C. Cir. 2016) (upholding Exemption 7(D) withholding of sources who provided "specific

detailed information that is singular in nature," which is "the kind of information that, if it were

revealed to the public, could be traced to a particular source"). Based on the totality of the

circumstances—including the sources' relation to the crime, the crime's violent nature, and the

"very real threat" of reprisals faced by Iraqis willing to cooperate with U.S. personnel at the

time, *see* Hardy Decl. ¶ 41—the Court concurs with the FBI's inferences that the sources would

not have provided assistance to the FBI without an expectation that their names, identifying

information, and the substance of the information they provided would remain confidential.[7] The

Court therefore finds that an implied assurance of confidentiality should be inferred as to the

FBI's sources for its investigation into Vincent's kidnapping and murder, and that information

provided by those sources was properly withheld under Exemption 7(D).

## II.     Other Exemptions

The FBI also argues that it is entitled to summary judgment with respect to the

withholdings and redactions it has made pursuant to Exemptions 5, 6, 7(C), and 7(E). Plaintiff

does not appear to challenge the FBI's withholdings and redactions under these exemptions. She

does not mention any potential challenges to Exemption 5 or Exemption 7(E). And as to

Exemptions 6 and 7(C), she merely states that "[s]hould the Court grant [her] motion for

---

[7] It is of no relevance that the crimes occurred fifteen years ago or that the FBI's investigation into them may no longer be active. *See Halpern*, 181 F.3d at 300 ("[I]t makes no difference in our analysis whether now, in hindsight, the objective need for confidentiality has diminished; what counts is whether then, at the time the source communicated with the FBI, the source understood that confidentiality would attach."); *Hale*, 99 F.3d at 1031 n.5 ("In conducting the source-by-source review, we must look to the circumstances at the time the communication was made to the FBI."); *Ortiz*, 70 F.3d at 733 ("The status of the investigation is . . . immaterial to the application of the exemption.").

summary judgment as to Exemption 7(D), she would not oppose withholding of identifying information" pursuant to these exemptions, while also apparently seeking to reserve her rights to contest those withholdings "[i]n the event that the FBI would seek to apply the exemptions overbroadly and continue to substantially withhold the witness statements." Pl. Mot. at 12-13.

Upon the Court's review of the Hardy Declaration and the FBI's *Vaughn* Index, however, it finds that the FBI's submissions are sufficient and summary judgment is also appropriate as to its withholdings under Exemptions 5, 6, 7(C), and 7(E). *See N.Y. Legal Assistance Grp., Inc v. U.S. Dep't of Educ.*, No. 15 Civ. 3818 (LGS), 2017 WL 2973976, at *2 (S.D.N.Y. July 12, 2017) (granting summary judgment to agency "without further discussion on the portions of documents" withheld under exemptions that plaintiff did not challenge); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 738 (S.D.N.Y. 2011) (granting summary judgment to agency where plaintiffs "opted not to challenge defendants' claimed assertions" to certain exemptions, even though plaintiffs did so "'[s]olely in the interest of efficiency' and without 'conced[ing] that [d]efendants' *Vaughn* indexes and declarations satisfy the burden to justify these redactions,'" because "[r]egardless of plaintiffs' reasons, they have waived any argument that the exemptions were improperly asserted").

### III.   Segregability

Under FOIA, any "reasonably segregable" information in a responsive record must be released. *See* 5 U.S.C. § 552(b). Non-exempt information is not reasonably segregable, however, when it is "inextricably intertwined" with the exempt information in a record "such that disclosure would compromise the confidentiality of [exempt] information that is entitled to protection." *Hopkins v. U.S. Dep't of Housing and Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991) (citation omitted). Moreover, "disclosure is not required when, after segregation, all that is left is 'a few nuggets of non-intertwined' information." *ACLU v. U.S. Dep't of Justice*, 252 F. Supp. 3d

217, 227 (S.D.N.Y. May 2, 2017) (collecting cases); *see also Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 53 (2d Cir. 1985) ("The fact that there may be some nonexempt matter in documents which are predominantly exempt does not require the district court to undertake the burdensome task of analyzing approximately 300 pages of documents, line-by-line.") (citation omitted). In analyzing segregability issues, an agency is "entitled to a presumption that it complied with its obligation to disclose reasonably segregable material." *Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 393-94 (S.D.N.Y. 2014).

Although Plaintiff argues on reply that the FBI failed to properly segregate information, *see* Pl. Reply at 9-10, she did not raise any issues regarding segregability in her cross-motion—despite the fact that the FBI had done so, explicitly arguing that it had produced all reasonably segregable portions of the responsive records, *see* FBI Mot. at 23-24—and the Court need not address this argument for that reason alone. *See CE Int'l Res. Holdings LLC v. S.A. Minerals Ltd. P'ship*, No. 12 Civ. 8087 (CM), 2012 WL 6178236, at *2, (S.D.N.Y. Dec. 10, 2012) ("A party may not raise an argument for the first time on reply.") (quoting *Admerasia, Inc. v. U.S. Postal Serv.*, No. 00-9784, 2004 WL 895552, at *4 n. 5 (S.D.N.Y. Apr. 27, 2004)).

In any event, the FBI has sufficiently demonstrated that the records in question do not contain reasonably segregable non-exempt material. As detailed in the Hardy Declaration, Plaintiff only challenges 632 pages of the overall 2,572 processed responsive pages.[8] *See* Hardy Decl. ¶ 81. Of those 632 pages, 204 pages were released in part, and 428 pages were withheld in full. *See id.* The 204 pages that were released in part contain "a mixture of material that could be segregated for release and exempt material that would trigger foreseeable harms protected against" by the asserted FOIA exemptions. Hardy Decl. ¶ 82. The FBI explained that the

---

[8] This number includes the 2,571 pages of responsive records and the one video. *See* Hardy Decl. ¶ 4.

withheld portions of these pages were "either exempt by itself" or were "so intertwined with non-exempt information that it was not reasonable to release additional information," and that "[f]urther segregation would result in the release of nothing but meaningless words or sentence fragments." *Id.* As to the 428 pages that were withheld in full, the FBI explained that those pages were either "fully covered" by Exemption 7(D)'s implied confidentiality or "overlapping FOIA exemptions," or the FBI had determined that "any non-exempt information on these pages was so intertwined with exempt material that no information could be reasonably segregated for release." Hardy Decl. ¶ 83. According to the FBI, "[a]ny further segregation" of the "intertwined material" contained in these 428 pages would produce only "disjointed words, phrases, or sentences that taken separately or together, would have minimal or no informational content." *Id.* On reply, Plaintiff contends that the FBI's "brief and generic assurance that it segregated and produced useful material is not plausible," Pl. Reply at 10, but she has not provided any basis to defeat the presumption of good faith to which the Hardy Declaration is entitled. *See ACLU*, 252 F. Supp. 3d at 229. The Court thus finds that the FBI has demonstrated that all reasonably segregated non-exempt material has been disclosed, and is entitled to summary judgment.[9]

## CONCLUSION

The Court is sympathetic to Plaintiff and her quest to learn as much as she can about the circumstances surrounding the horrific murder of her husband. In this case, however, the law is on the Government's side, as the FBI has adequately demonstrated the basis for its inferences that the sources here provided information with an implied assurance of confidentiality.

---

[9] Plaintiff acknowledges that the FBI "appropriately released" certain statements provided by "a single individual." *See* Pl. Mot. at 12; Friedman Decl. Ex. 16. She argues, however, that the fact that the FBI released *some* witness statements suggests that the FBI has unreasonably withheld others, which "presumably include similarly untraceable information" with respect to the source's identity. *See* Pl. Mot. at 12. The Court does not agree. The more logical conclusion, further reinforced by the Hardy Declaration and the *Vaughn* Index, is that the FBI released "segregable information when it was possible to do so . . . , while applying Exemption 7(D) to source information where an assurance of confidentiality should be inferred." FBI Reply at 10.

Accordingly, the FBI's motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 28 and 33, to enter judgment in favor of the FBI, to lift the stay, and to close this case.

SO ORDERED.

Dated:     October 20, 2021
           New York, New York

                                                  _____
                                                  Ronnie Abrams
                                                  United States District Judge